# KLEIN ZELMAN ROTHERMEL JACOBS & SCHESS LLP

ATTORNEYS AT LAW

485 MADISON AVENUE

NEW YORK, NEW YORK 10022-5803

TEL (212) 935-6020

FAX (212) 753-8101

September 27, 2017

**VIA ECF**
Hon. Katharine H. Parker
United States Magistrate Judge
Daniel Patrick Moynihan U.S. Courthouse
500 Pearl Street, Courtroom 17D
New York, New York 10007-1312

> Re:  **Drozd, et al. v. 340 West 46th Street Corp. d/b/a Le Rivage, et al.**
> **Case No. 17-CV-922**

Dear Judge Parker:

We represent Defendants in the above-referenced action and submit this letter in opposition to Plaintiffs' motion to re-open the deposition of Defendant Paul Denamiel ("Paul"). We also ask that Your Honor hold this motion in abeyance until Defendants can submit their own motion to compel, which Defendants can submit by October 3rd.[1]

Plaintiffs rely on three grounds for re-opening: (1) alleged inconsistencies as to ownership of 340 West 46th Street Corp. d/b/a Le Rivage ("Le Rivage" or the "Restaurant"); (2) alleged inconsistencies as to whether Defendant Marcel Denamiel ("Marcel") was paid; and (3) alleged inconsistencies as to whether Paul ever called Plaintiffs "retarded". Plaintiffs' letter is misleading and does not provide a basis for reopening the deposition after the close of discovery.

**Marcel Denamiel's Alleged Ownership:**

In their Complaint, filed February 8, 2017, Plaintiffs brought wage and hour claims under both the Fair Labor Standards Act and New York Labor Law, as well as claims of age discrimination and hostile work environment based upon age. The longest possible relevant statutory period would begin on February 8, 2011, six years before the filing of the Complaint.

Both Paul and Marcel testified that Marcel was never an owner of Le Rivage. Their former account, Bill Furdyna ("Furdyna"), recalled otherwise. Plaintiffs fail to advise the Court that even if Furdyna were correct – and he was testifying from memory, as were Paul and Marcel - Furdyna testified that Marcel's alleged ownership interest in Le Rivage ended 14 years ago, in 2003, eight years before the earliest statutory period. (Exhibit A, Furdyna TR. 8-9.) Thus, even if Furdyna were

---

[1] This time is needed because Plaintiffs repeatedly failed to produce a promised written response to Defendants' second deficiency letter and were unavailable to meet and confer until this afternoon, when counsel could not give a response on multiple items until she checked with senior counsel. Even without this delay the undersigned is out of the country beginning later today and continuing for the remainder of the work week and Jane B. Jacobs is unavailable on Friday.

KLEIN ZELMAN ROTHERMEL JACOBS & SCHESS LLP

Hon. Katharine H. Parker
Page 2
September 27, 2017

correct – he concedes that he "didn't see any paperwork" as to Marcel's ownership – it is immaterial to any issue in this case.[2]  (Exhibit A, Furdyna TR. 8-9.)

**Marcel's Alleged Payment:**

Furdyna also testified that Marcel was paid by Le Rivage until he retired in 2003, but not thereafter.  (Exhibit A, Furdyna TR. 8-9.)  Again, whether Marcel was paid eight years before the earliest date of the statutory period is not at all relevant to the current lawsuit.

Plaintiffs are incredulous at the notion that Marcel "worked for free." (Motion, p. 2.)  Marcel is an unmarried 80 year old man with few outside interests and no hobbies who retired in 2003.  (Exhibit A, Furdyna TR. 8-9; Exhibit C, Marcel TR. 90.)  With little else to occupy his days, he spends his time at his son's restaurant, socializing with long-time customers.

Plaintiffs also focus on Furdyna's testimony that from 2011 to 2014, the Restaurant underreported its income by $350,000.  They believe they should be able to inquire as to whether that money was paid to Marcel.  (Motion, p. 2.)  There is no evidence that he was; Marcel, Paul and Furdyna all testified without contradiction that Marcel was not paid after he retired in 2003, so there is no need for further questioning on this topic.  Moreover, Plaintiffs neglect to mention that Le Rivage voluntarily filed amended tax returns, correcting the underreporting and paying the amount due.  (Exhibit A, Furdyna TR. 61.)

**Paul's Use of the Term "Retard":**

Contrary to the representation made in Plaintiffs letter, Paul did not testify that "he never used the term 'retarded.'"  (Motion, p. 3.)  The sole question asked of Paul on this topic was whether he ever referred to any of the *Plaintiffs* as retarded, which he denied.  Subsequent to Paul's deposition, Plaintiffs presented a recording made by someone who is not a party to this case, in which Paul refers to *someone* as "retarded."  That is no evidence that Paul called any of the *Plaintiffs* "retarded".  There also is no explanation of why Plaintiffs could not have obtained this recording earlier.  They have been in regular contact throughout with that former employee's counsel, and presumably could just have asked for it.

Moreover, whether Paul used the term "retarded" is ultimately irrelevant.  Plaintiffs have claimed that they were discriminated and harassed based upon their *age*.  However, Plaintiff Katta, who was 39 at the time the Complaint was filed, testified that Paul used that term towards her throughout her employment.[3]  (Exhibit D, Kata TR. 136, 147.)  Plaintiff Stachnik testified that he

---

[2] Defendants also have provided documents showing Paul as 100% owner (*see, e.g.,* Exhibit B, bearing Bates Stamps D000058) and advised Plaintiffs that there are no documents from the statutory period that show Marcel as owner, because indisputably, he was not an owner during this time or for either years before that period.
[3] The Complaint incorrectly states that all Plaintiffs are over the age of 40.  (Complaint, ¶ 53.)

KLEIN ZELMAN ROTHERMEL JACOBS & SCHESS LLP

Hon. Katharine H. Parker
Page 3
September 27, 2017

used it when younger employees made mistakes.  (Exhibit E, Stachnik TR. 255-256.)  Thus, even if Paul used that term towards Plaintiffs, it was unrelated to age.

**Legal Standard:**

  Leave to re-open a deposition should only be granted where doing so is consistent with the factors set forth in Rule 26.  Official Comm. of Unsecured Creditors of Exeter Holdings, Ltd. v. Haltman, No. CV135475JSAKT, 2016 WL 1180194, at *3 (E.D.N.Y. Mar. 25, 2016).  Those factors include, among other things, "'whether the second deposition of the witness would be unnecessarily cumulative, whether the party requesting the deposition has had other opportunities to obtain the same information, and whether the burden of a second deposition outweighs its potential benefit.'" [4] Id.  Moreover, a deposition should not be re-opened where the allegedly new information is not relevant.  See Thompson v. Spota, No. CV142473JMAAKT, 2017 WL 1155799, at *5 (E.D.N.Y. Mar. 27, 2017) (denying request to re-open deposition due to an alleged inconsistency that did "not strike at the heart of Plaintiff's allegations" and therefore was only minimally relevant).[5]

  Plaintiffs have had ample opportunity to obtain the information sought, which, in any event, is not relevant to their claims in this case.  Therefore, Plaintiffs motion to re-open the deposition of Paul Denamiel should be denied.[6]

  Thank you in advance for your consideration.

         Respectfully Yours,

         /s/ Jesse Grasty
         Jesse Grasty

---

[4] The cases relied upon by Plaintiffs do not support their position.  Plaintiffs cite *dicta* from Chang v. Safe Horizons, No. 03 CIV.10100 WHP RLE, 2004 WL 1874965, at *1 (S.D.N.Y. Aug. 20, 2004), which ultimately denied the request to re-open a deposition.  In Keck v. Union Bank of Switzerland, No. 94CIV.4912(AGS)(JCF), 1997 WL 411931, at *2 (S.D.N.Y. July 22, 1997) the court granted a motion to extent there was a question about how evidence had been destroyed and denied the remainder of the motion because "the requested discovery does not appear to be *relevant*." Id. (emphasis added).  In Vincent v. Mortman, No. 3:04 CV 491 (JBA), 2006 WL 726680, at *1 (D. Conn. Mar. 17, 2006) new evidence called into question whether a doctor had given a specific order, which opened up a line of questioning not previously applicable.

[5] Plaintiffs claim that the alleged issues regarding Marcel's ownership of and payment by the Restaurant should be addressed now, because waiting until trial "may preclude Plaintiffs from seeking summary judgment on the issue of Marcel's employer status."  (Motion, p. 3.)  Simply put, even if as recently as 2003 Marcel was an owner of the Restaurant and drew a salary, there is no authority that would allow a conclusion that such evidence indicates he was an employer from 2011 to 2017.

[6] In the event that the Court elects to grant Plaintiffs' motion, Defendants submit that their questioning should be limited to the alleged new information. *See* Official Comm. of Unsecured Creditors of Exeter Holdings, Ltd. v. Haltman, No. CV135475JSAKT, 2016 WL 1180194, at *3 (E.D.N.Y. Mar. 25, 2016) (internal citations omitted) "Where the deposition is re-opened because of newly discovered information, the questioning of the witness is limited to those questions relating to the newly produced information").

# EXHIBIT A

Page 1

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK

2
     - - - - - - - - - - - - - - - - - - -x
3
     MARTA HALON DROZD, RENATA KASSAN, EWA
4    KATA, AGNESZKA MIKOLAJCZAK, ELVIRA MOLITZ,
     and ELIZABETH STACHNIK,
5
                    Plaintiffs,
6
           -against-
7
     340 WEST 46TH STREET CORP., d/b/a
8    LE RIVAGE, MARCEL DENAMIEL, and PAUL
     DENAMIEL,
9
                    Defendants.
10
     - - - - - - - - - - - - - - - - - - -x
11
                    1250 Broadway
12                  New York, New York
13                  September 11, 2017
                    2:12 p.m.
14
15
16       DEPOSITION of WILLIAM FURDYNA, the
17   Non-Party Witness in the above-entitled
18   action, held at the above time and place,
19   taken before Elena A. Egan, a Shorthand
20   Reporter and Notary Public of the State of
21   New York, pursuant to the Federal Rules of
22   Civil Procedure, subpoena and stipulations
23   between Counsel.
24
25              *      *      *

Page 6

1      A.   William Furdyna.
2      Q.   Where do you reside?
3      A.   123 Ridgefield Avenue, South
4   Salem, New York 10590.
5          MR. PECHMAN:  Good afternoon.
6          THE WITNESS:  Hi.
7      Q.   First things first, what's the
8   correct pronunciation of your name?
9      A.   Furdyna.
10         MR. PECHMAN:  Mr. Furdyna,
11     although we've already been
12     introduced, let me reintroduce myself
13     for the record.  My name is Louis
14     Pechman.  I represent a group of
15     former employees of Le Rivage who are
16     suing the restaurant, Paul and Marcel
17     for wage/hour violations and also for
18     discrimination.
19     Q.   Have you ever testified at a
20  deposition before?
21     A.   Once, a long time ago.
22     Q.   What type of case?
23     A.   I forgotten.  It was so long
24  ago.  It wasn't -- it was very short.
25     Q.   You weren't sued?

Page 7

1              W. FURDYNA
2      A.   No.
3      Q.   And you're a CPA?
4      A.   Yes, I am.
5      Q.   Where did you get your CPA
6   degree from?
7      A.   New York.
8      Q.   Okay.  And what school did you
9   attend?
10     A.   Fordham University.
11     Q.   Now, you've been the accountant
12  for Le Rivage for many years?
13     A.   Since the inception.
14     Q.   Tell us how the inception of
15  Le Rivage restaurant occurred.
16     A.   Paul and Marcel bought the
17  restaurant from the previous opener.
18     Q.   And who was the previous owner?
19     A.   Auguste Denamiel.
20     Q.   And what was the nature of that
21  transaction; cash?
22     A.   It was inventoried, and they
23  entered into a lease with Auguste.
24     Q.   So Auguste kept the property and
25  Paul and Marcel took control of the

Page 8

1              W. FURDYNA
2   restaurant?
3      A.   Correct.
4      Q.   Do you recall about how much in
5   rent they were paying at the time?
6      A.   I believe -- no.  Not off the
7   head.  It was about $4,000, but I don't --
8      Q.   And in terms of the ownership of
9   the new entity, what was the percentage?
10  Was that 50/50 between Paul and Marcel?
11     A.   Correct.
12     Q.   Did that -- and how do you know
13  that, by the way?
14     A.   Because I was the accountant
15  back then.  I didn't see any paperwork.
16  Basically a 50/50 deal.
17     Q.   How did that work in terms of
18  was it a corporation, an LLC?
19     A.   It was an S corporation.
20     Q.   Why did you determine that an S
21  corporation would be the proper way?
22     A.   That's what they wanted.
23     Q.   Who wanted?
24     A.   Paul and Marcel.
25     Q.   Okay.  And between Paul --

Page 9

1              W. FURDYNA
2   and what year was that?
3      A.   1997.
4      Q.   Now, the restaurant previously
5   was owned by who?
6      A.   Auguste Denamiel.
7      Q.   So to be clear, the restaurant
8   was basically they took over the
9   inventory, and they took over a lease?
10     A.   Correct.
11     Q.   Did -- to your knowledge, did
12  the ownership of the restaurant change in
13  any respect?
14     A.   In 2003, Marcel retired.
15     Q.   What do you mean he retired?
16     A.   He was 65, and he retired.  He
17  said, you know, basically, full ownership
18  went to Paul now.
19     Q.   What type of transaction was
20  that?
21     A.   It was, you know, basically no
22  cash involved in it.
23     Q.   A gift?
24     A.   A gift -- well, yeah.
25     Q.   What were the mechanics of the

3 (Pages 6 - 9)

Page 58

```
1            W. FURDYNA
2    A.   Not that I'm aware of.
3    Q.   Do you have any other clients
4  where basically somebody is working for
5  free 60 hours a week?
6    A.   No.
7    Q.   Pretty unusual?
8    A.   I guess it's unusual.  He was
9  there to help out Paul.
10   Q.   Did you have any conversations
11 with him about getting paid?
12   A.   No.
13   Q.   And is it the sort of thing
14 where he's collecting Social Security, he
15 has income from these properties that he
16 owns so he really doesn't need to draw a
17 salary?  Is that part of it?
18   A.   I'm not sure what you're talking
19 about income from the properties because
20 the properties haven't been -- up until
21 recently, they haven't been making any
22 money.
23   Q.   But he has one property that he
24 gets income from; right?
25   A.   He hasn't been drawing that
```

Page 59

```
1            W. FURDYNA
2  much.  Recently, he started drawing money
3  from the property.  But before that, he
4  wasn't making any money on the properties.
5    Q.   So he's living on Social
6  Security --
7    A.   That's correct.
8    Q.   -- basically?
9         And what's his Social Security,
10 approximately?
11   A.   Minimum.
12   Q.   So how could it be that he's
13 just living on Social Security in
14 Manhattan?
15   A.   He doesn't have any expenses,
16 and he had money in the bank.
17   Q.   Mm-hmm.  How do you account
18 for -- as the accountant for Le Rivage,
19 how do you keep track of the cash that's
20 coming in for people who pay in cash?
21   A.   It's accounted for now.
22   Q.   Now it's accounted for?
23   A.   Mm-hmm.
24   Q.   Yes?
25   A.   Yes.
```

Page 60

```
1            W. FURDYNA
2    Q.   Was there a time that it wasn't
3  accounted for?
4    A.   In 2015, in June of 2015, Paul
5  informed me that he didn't report or he
6  didn't tell me about the cash that he
7  received.
8    Q.   And how much cash was that?
9    A.   It went back to 2011.  It
10 amounted to around $350,000 a year.
11   Q.   Okay.  And that was an IRS
12 issue?
13   A.   Amended returns were filed.
14   Q.   How did it come about that Paul
15 told you that there was $350,000 a year in
16 cash that wasn't being reported?
17   A.   I discovered a little -- I
18 needed more cash to pay the tips,
19 actually.  And in 2014 -- I was doing it
20 in June of 2015 -- I informed him we were
21 short.  Somehow it doesn't jive.  And
22 that's when he informed me that he had
23 cash.
24   Q.   So did Paul tell you how he took
25 the $350,000 a year in cash --
```

Page 61

```
1            W. FURDYNA
2    A.   Nope.
3    Q.   -- out of the business?
4    A.   Nope.
5    Q.   Do you have an understanding of
6  how that operated?
7    A.   I just picked it all up as
8  income.
9    Q.   Okay.  So you filed amended
10 returns, and then you had to pay, I guess,
11 a whopping tax bill?
12   A.   That's correct.  That's what the
13 condo sale was about.
14   Q.   Okay.  So the condo sale was to
15 pay taxes on unreported income that the
16 restaurant received?
17   A.   Correct.
18   Q.   So the total of that, if it's
19 five years at 350, you're talking about --
20   A.   It was '11, '12, '13 and '14,
21 four years.
22   Q.   Four years at $350,000 a year?
23   A.   Roughly, yeah.
24   Q.   So do you know now whether or
25 not the -- all of the cash was reported?
```

16 (Pages 58 - 61)

# EXHIBIT B

Form **1125-E**
(Rev. December 2013)
Department of the Treasury
Internal Revenue Service

**Compensation of Officers**

▶ Attach to Form 1120, 1120-C, 1120-F, 1120-REIT, 1120-RIC, or 1120S
▶ Information about Form 1125-E and its separate instructions is at *www.irs.gov/form1125e.*

OMB No. 1545-2225

Name
340 WEST 46TH STREET CORPORATION

Employer Identification number

Note. Complete Form 1125-E only if total receipts are $500,000 or more. See instructions for definition of total receipts.

| (a) Name of officer | (b) Social security number | (c) Percent of time devoted to business | Percent of stock owned (d) Common | (e) Preferred | (f) Amount of compensation |
|---|---|---|---|---|---|
| 1   PAUL DENAMIEL | | 100.00% | 100.00% | % | |
| | | % | % | % | |
| | | % | % | % | |
| | | % | % | % | |
| | | % | % | % | |
| | | % | % | % | |
| | | % | % | % | |
| | | % | % | % | |
| | | % | % | % | |
| | | % | % | % | |
| | | % | % | % | |
| | | % | % | % | |
| | | % | % | % | |
| | | % | % | % | |
| | | % | % | % | |
| | | % | % | % | |
| | | % | % | % | |
| | | % | % | % | |
| | | % | % | % | |
| | | % | % | % | |

**2** Total compensation of officers . . . . . . . . . . . . . . . . . . . **2**

**3** Compensation of officers claimed on Form 1125-A or elsewhere on return . . . . . . . . . . . **3**

**4** Subtract line 3 from line 2. Enter the result here and on Form 1120, page 1, line 12 or the appropriate line of your tax return . . . . . . . . . . . . . . . . . . . . . . . . **4**

For Paperwork Reduction Act Notice, see separate instructions.
HTA

Form **1125-E** (Rev. 12-2013)

D000058

# EXHIBIT C

Page 1

1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK

2
   - - - - - - - - - - - - - - - - - - -x

3
   MARTA HALON DROZD, RENATA KASSAN, EWA

4  KATA, AGNESZKA MIKOLAJCZAK, ELVIRA MOLITZ,
   and ELIZABETH STACHNIK,

5
                        Plaintiffs,

6
          -against-

7
   340 WEST 46TH STREET CORP., d/b/a

8  LE RIVAGE, MARCEL DENAMIEL, and PAUL
   DENAMIEL,

9
                        Defendants.

10
   - - - - - - - - - - - - - - - - - - -x

11
                        1250 Broadway

12                      New York, New York

13                      September 11, 2017
                        10:08 a.m.

14

15

16     VIDEOTAPED DEPOSITION of MARCEL

17  DENAMIEL, the Defendant in the

18  above-entitled action, held at the above

19  time and place, taken before Elena A.

20  Egan, a Shorthand Reporter and Notary

21  Public of the State of New York, pursuant

22  to the Federal Rules of Civil Procedure,

23  notice and stipulations between Counsel.

24

25            *       *       *

Page 90

```
 1        M. DENAMIEL
 2    Q.   Which government?
 3    A.   American government.
 4    Q.   Oh, so you're getting Social
 5 Security?
 6    A.   I'm 80 years old; you know that.
 7    Q.   Okay.  How long have you been
 8 receiving Social Security?
 9    A.   I don't know.  After 65.
10 Probably 65.
11    Q.   Okay.  So did you stop working
12 on a salary for your brother or for Paul
13 when you started --
14    A.   For him I stop.
15    Q.   Okay.  And that's because you
16 started collecting Social Security?
17    A.   Yeah.
18    Q.   Okay.  So just as far as when
19 you turned 62 or when you turned 65, you
20 stopped collecting a paycheck?
21    A.   I don't remember.
22        [Discussion held off the
23    record.]
24    A.   I don't remember if I was 62 or
25 65.
```

Page 91

```
 1        M. DENAMIEL
 2    Q.   But it was one of those?
 3    A.   Yeah.  Something like that.
 4    Q.   So -- and I understand that.
 5 It's because if you're collecting Social
 6 Security, if you're making money, then you
 7 have to give back to Social Security?
 8    A.   Yes.
 9    Q.   So instead of collecting a
10 regular paycheck, you're just getting cash
11 every so often from your son?
12    A.   No.  Never give me -- never give
13 me cash.  When I needed $50, I ask it to
14 him or something like that.
15    Q.   How much is your Social Security
16 benefit?
17        MS. JACOBS:  Objection.  Don't
18    answer the question.
19    Q.   How much is your Social Security
20 benefit?
21    A.   Is --
22        MS. JACOBS:  Don't answer it.
23        THE WITNESS:  All right.
24    Q.   Do you have a pension from the
25 French government?
```

Page 92

```
 1        M. DENAMIEL
 2    A.   No.
 3    Q.   Do you have any other source of
 4 income --
 5    A.   No.
 6    Q.   -- other than Social Security?
 7    A.   No.
 8    Q.   Do you pay rent currently?
 9    A.   A little rent.
10    Q.   Pardon me?
11    A.   Little rent.
12    Q.   How much rent do you pay?
13    A.   $500.
14    Q.   The cash that Paul gives you --
15        MS. JACOBS:  Objection.  The
16    witness has answered five times that
17    he's not getting cash.
18    Q.   How did --
19        MS. JACOBS:  Five times.  I've
20    been counting.
21        MR. PECHMAN:  Well, actually --
22    Q.   How does Paul give you the
23 money; is it check or is it cash?
24        MS. JACOBS:  Marcel, you can
25    answer.
```

Page 93

```
 1        M. DENAMIEL
 2        THE WITNESS:  I tell him
 3    already.
 4    A.   $50, he give me sometime like
 5    that.  If I needed to buy something.
 6    Q.   Does he give you that money in
 7 check or in cash?
 8    A.   Once in a while in cash.
 9    Q.   Okay.  Does he ever give you
10 money by check?
11    A.   No.
12    Q.   Okay.  Okay.  Okay.  Do you own
13 property in Bloomingburg, New York?
14    A.   No.
15    Q.   Do you know who -- anybody in
16 your family own property in Bloomingburg,
17 New York?
18    A.   My aunt.
19    Q.   Your aunt?
20    A.   (Indicating.)
21    Q.   Who's your aunt?
22    A.   No.  My sister-in-law.  I'm
23 sorry.  My sister-in-law.  My
24 sister-in-law.  I make a mistake.
25    Q.   Okay.  When's the last time you
```

24 (Pages 90 - 93)

# EXHIBIT D

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - x
MARTA HALON DROZD, RENATA KASSAN,
EWA KATA, AGNIESZKA MIKOLAJCZAK
ELVIRA MOLITZ, and ELZBIETA STACHNIK,

                 Plaintiffs,

                                      Case No.
    - against -                  17-CV-922
                                      (RMB)(KHP)

340 WEST 46TH STREET CORP., d/b/a LE
RIVAGE, MARCEL DENAMIEL, and PAUL
DENAMIEL

                 Defendants.

- - - - - - - - - - - - - - - - - - - x


        DEPOSITION of EWA KATA, taken by Defendants at

485 Madison Avenue, New York, New York, on Friday,

August 25, 2017, commencing at 10:09 a.m., before

Pamela Grimaldi, a Registered Professional Reporter

and Notary Public within and for the State of New

York.

Page 134

E. Kata

(1)
(2) There are younger people looking for a job.
(3)     Q    Did he say on other occasions
(4) that, You're replaceable by younger employees?
(5)     A    Everybody's replaceable, that's
(6) what he said, yes, and younger employees.
(7)     Q    There's a difference between
(8) saying, Everybody's replaceable.  I'm
(9) replaceable.  I'd like to think I'm pretty
(10) young.  But everyone's replaceable.
(11)     A    Yes, I understand that.
(12)     Q    Did he say, You're replaceable, or
(13) did he say, You're replaceable by younger
(14) employees?
(15)     A    He did say that time, that
(16) recording, says by younger employees.
(17)     Q    Aside from the one recording that
(18) you're referring to, did he say on other
(19) occasions that you're replaceable by younger
(20) employees?
(21)     A    Yes.
(22)     Q    When?
(23)     A    I don't remember, but he did say a
(24) few times, yes.
(25)     Q    And he said it to you?

Page 135

E. Kata

(1)
(2)     A    Yes.
(3)     Q    Okay.  And he said it to other
(4) people?
(5)     A    I don't know what he said to other
(6) people, but to me, yes.
(7)     Q    Okay.  Did anyone overhear him say
(8) this to you?
(9)     A    I don't know.  I mean, we usually
(10) talk on the bar, or, you know, when he was
(11) saying.  Sometimes he yell.  I don't know, to be
(12) honest.
(13)     Q    He said it when he was yelling
(14) sometimes?
(15)     A    He was yelling, yes.  Yeah.
(16)     Q    You agreed earlier that you
(17) recorded a number of conversations with Paul.
(18)     A    Uh-huh.
(19)     Q    Does Paul yell in any of those
(20) conversations?
(21)         MS. RODRÍGUEZ:  Objection.
(22)     A    Not that particulars, yes, but he
(23) did yell.
(24)     Q    Okay.  Look at paragraph 53.
(25)     A    Uh-huh.

Page 136

E. Kata

(1)
(2)     Q    It says, The current servers
(3) working at Le Rivage who were hired after
(4) Plaintiffs resigned are all in their 20s and
(5) 30s.  Plaintiffs are all 40 years old -- over 40
(6) years old.
(7)     A    Uh-huh.
(8)     Q    You're 40, you said?
(9)     A    Uh-huh.
(10)     Q    When's your birthday?
(11)     A    August 8.
(12)     Q    August 8?
(13)     A    Uh-huh.
(14)     Q    So you just turned 40?
(15)     A    Yes.
(16)     Q    So when you look at the top of
(17) this document, it's dated February 8, 2017.
(18)     A    Uh-huh.
(19)     Q    So in February you were 39?
(20)     A    Yeah.
(21)     Q    Okay.  So in paragraph 53 where it
(22) says you're all over 40, that's not correct?
(23)     A    Not to me, yes.  I provide my age
(24) that time, yeah.
(25)     Q    Okay.

Page 137

E. Kata

(1)
(2)         (A discussion was held off
(3)     the record.)
(4)         (Whereupon, a recess was
(5)     taken between 12:37 and 12:42 p.m.)
(6)     THE WITNESS:  Can I clarify
(7)     something?
(8) BY MR. GRASTY:
(9)     Q    Please.
(10)     A    The second girl never had a break
(11) on Wednesdays, Saturdays, and Sundays.  She stay
(12) all day.
(13)     Q    Okay.  We'll look at the records
(14) on that.
(15)         Will you look at paragraph 53,
(16) please.
(17)     A    Sure.
(18)     Q    It says, in fact -- I think we
(19) just read this one.  It says, The current
(20) servers working at Le Rivage who were hired
(21) after Plaintiffs resigned were all in their 20s
(22) and 30s.
(23)     A    I'm 39.  I was 39, yeah.
(24)     Q    That's fine.
(25)         Do you know the names of anyone

35   (Pages 134 to 137)

Page 146

E. Kata

(1)
(2) years, he replied, That's too long; we're going
(3) to change that soon.
(4) Did you overhear this
(5) conversation?
(6) A   Yes.
(7) Q   You personally overheard it?
(8) A   Uh-huh.  It was numerous times,
(9) yeah.
(10) Q   It doesn't say numerous times.
(11) A   Okay.  But it would be before.
(12) How long you work here?  It was other people
(13) too.  Oh, it's too late -- it's too long; we
(14) have to change that.
(15) Q   Okay.  Now, I believe earlier that
(16) no one actually said to you that you were too
(17) old to work there, correct?
(18) A   No.
(19) Q   So paragraph 57 where it says,
(20) Plaintiffs Mikolajczak, Halon Drozd, and Kata --
(21) that's you, right?
(22) A   Uh-huh.
(23) Q   -- were also told they were too
(24) old to work at Le Rivage.
(25) That's not accurate, correct?

Page 147

E. Kata

(1)
(2) A   It was told to Mikolajczak and
(3) Drozd.
(4) Q   But not to you?
(5) A   I didn't hear it to him saying
(6) that.
(7) Q   Okay.  Paragraph 58, Paul and
(8) Marcel yelled at Plaintiffs, calling them
(9) morons, stupid, and retards.
(10) Did he ever do this to you?  Paul
(11) first.  Did Paul ever call you any of those
(12) words?
(13) A   Yes.
(14) Q   Which words did he use towards
(15) you?
(16) A   Stupid.  He called us all together
(17) morons, You morons.
(18) Q   What about retards?
(19) A   Retards he called us, too, yeah.
(20) Q   You're aware that Paul's son has
(21) autism?
(22) A   No, I'm not.
(23) Q   Okay.  It would seem odd that
(24) someone who has an autistic child would call
(25) someone a retard?

Page 148

E. Kata

(1)
(2) MS. RODRÍGUEZ:  Objection.
(3) A   Doesn't change the fact he did
(4) call us those names.
(5) Q   You have a lot of recordings of
(6) Paul.  We've established that.  Does he use any
(7) of those words on any of those recordings?
(8) A   I'm not sure.  I don't remember.
(9) Q   Okay.  What about Marcel?  Did
(10) Marcel use those words?
(11) A   Stupid, yes.
(12) Q   Moron?
(13) A   Piece of shit.  Stupid.
(14) Q   Let's focus on this.  Morons,
(15) retards, did Marcel use those words as well?
(16) A   Stupid, morons.
(17) Q   Okay.  Isn't a fact that none of
(18) your recordings reflect Marcel using those
(19) words?
(20) A   But that doesn't change the fact
(21) that he did say that.
(22) Q   That's not what I'm asking you.
(23) I'm asking if any of your recordings --
(24) A   You ask me if Marcel called me
(25) those --

Page 149

E. Kata

(1)
(2) Q   No.  What I'm -- you have to
(3) listen, because I asked you a different
(4) question.
(5) A   Okay.
(6) Q   Okay.  My current question is, do
(7) any of your recordings reflect Marcel using any
(8) of those words?
(9) A   I don't remember.  I don't --
(10) yeah.
(11) Q   Isn't it true that on one of your
(12) recordings you called Marcel stupid?
(13) A   I don't remember.
(14) Q   When was last time you listened to
(15) those recordings?
(16) A   I don't know.  A long time ago.
(17) Q   Did you produce all the recordings
(18) that you have?
(19) A   What I have, yes.
(20) Q   Paragraph 59, it says that, Marcel
(21) periodically cornered Plaintiffs, intimidated
(22) them with threats such as, I was in the war.
(23) You don't know who I know, you piece of shit.
(24) Did Marcel ever corner you?
(25) A   He was saying, You know I was in

38   (Pages 146 to 149)

# EXHIBIT E

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - x
MARTA HALON DROZD, RENATA KASSAN,
EWA KATA, AGNIESZKA MIKOLAJCZAK
ELVIRA MOLITZ, and ELZBIETA STACHNIK,

                    Plaintiffs,

                                            Case No.
        - against -                         17-CV-922
                                            (RMB)(KHP)

340 WEST 46TH STREET CORP., d/b/a LE
RIVAGE, MARCEL DENAMIEL, and PAUL
DENAMIEL

                    Defendants.

- - - - - - - - - - - - - - - - - - - - x




            CONTINUATION OF THE DEPOSITION of ELZBIETA

STACHNIK, taken by Defendants at 485 Madison Avenue,

New York, New York, on Thursday, September 14, 2017,

commencing at 9:43 a.m., before Pamela Grimaldi, a

Registered Professional Reporter and Notary Public

within and for the State of New York.

Page 252

E. Stachnik

(1)
(2) her back, sometimes just next to her, just -- it
(3) was like a surprise.
(4)          Q     Okay.  But the comments were
(5) directed to her?
(6)          A     Yes.
(7)          Q     All right.  What makes you say he
(8) was doing this to make fun of her?
(9)          A     Well, he knew she had hearing
(10) aids, but he was approaching Elvira and he was
(11) saying, Do you hear -- can you hear me?
(12)          Q     Okay.  You agree that it's
(13) important that a server be able to hear the
(14) customers at a restaurant, correct?
(15)          A     Of course.
(16)          Q     And it's also important that the
(17) server be able to hear the chef and communicate
(18) with the chef, correct?
(19)          A     Yes.
(20)          Q     Okay.  And you don't know how
(21) often Elvira had her hearing aid updated, do
(22) you?
(23)          MS. RODRÍGUEZ:  Objection.
(24)          A     I only know that she always had it
(25) in her ear.

Page 253

E. Stachnik

(1)
(2)          Q     Okay.  But you don't know like
(3) when was the last time she got a new one, for
(4) instance?
(5)          A     I don't know.
(6)          MR. GRASTY:  What was the
(7) objection?
(8)          MS. RODRÍGUEZ:  Objection to
(9) form.  I'm not going to explain all
(10) my objections to you.  That's
(11) improper, as you know.
(12)          MR. GRASTY:  I'm sorry,
(13) what's that?
(14)          MS. RODRÍGUEZ:  It was an
(15) objection to form.
(16)          MR. GRASTY:  Okay.  I don't
(17) think there was an issue with form
(18) there.  I asked what she knew.
(19)          MS. RODRÍGUEZ:  Okay.
(20) BY MR. GRASTY:
(21)          Q     Did Marcel -- excuse me.  Did
(22) Marcel ever call you a moron?
(23)          A     No.
(24)          Q     Did Marcel ever call you stupid?
(25)          A     Yes.

Page 254

E. Stachnik

(1)
(2)          Q     What was the scenario?
(3)          A     When I made a mistake.
(4)          Q     Okay.  Did Marcel ever call you a
(5) retard?
(6)          A     Yes.
(7)          Q     What was the scenario?
(8)          A     Sometimes when I did it in the
(9) wrong way, not the way he wanted to be done.
(10) Sometimes when he told me to do something and I
(11) didn't do it the way he wished me to do and I
(12) did it on my own, he then called me a retard.
(13)          Q     Would Marcel -- did you ever see
(14) Marcel call other employees stupid or retards if
(15) they made a mistake?
(16)          A     Yes.
(17)          (Whereupon, Paul Denamiel
(18)          entered the deposition room.)
(19)          Q     Would he say that to young
(20) employees, too, if they made a mistake?
(21)          A     He said it to everybody.
(22)          Q     Okay.  When they made a mistake?
(23)          A     When something happened in the
(24) restaurant.  Not exactly a mistake.
(25)          Q     Can you just elaborate on when

Page 255

E. Stachnik

(1)
(2) something happened.
(3)          A     For example, if you didn't put
(4) something where you should put it, or you
(5) didn't close something.
(6)          Q     Okay.  Did Paul ever call you a
(7) moron?
(8)          A     Yes.
(9)          Q     Okay.  What was the circumstances?
(10)          A     It was during rush hour in the
(11) kitchen when it was very busy.
(12)          Q     Okay.  Did something else happen
(13) that led him to saying that?
(14)          A     Sometimes a small thing could go
(15) on his nerves and then he would scream.
(16)          Q     Can you give me an example of the
(17) type of thing that would lead to this?
(18)          A     So, for example, if you took the
(19) plate that wasn't intended for you, when you
(20) ordered the table, the plates were set, and
(21) sometimes there were other people's plates.  And
(22) when you went into the kitchen and the plates
(23) were mixed, actually, you didn't know whose
(24) plates they were, just in that second you didn't
(25) know.

4   (Pages 252 to 255)

Page 256

E. Stachnik

(2) Q    Okay.  What about stupid, did Paul
(3) ever call you stupid?
(4) A    Yes.
(5) Q    Okay.  Same circumstances?
(6) A    Yes.
(7) Q    Okay.  What about "retard," did he
(8) ever use that word?
(9) A    Yes.
(10) Q    Same circumstances?
(11) A    Yes.
(12) Q    Did you ever hear Paul use those
(13) words toward younger employees?
(14) A    I think that he did.
(15) Q    Okay.  Did Marcel ever corner you,
(16) like back you into a corner?
(17) A    Yes.  When somebody made a mistake
(18) he would take me to a corner that was in between
(19) the kitchen and the restaurant.
(20) Q    When someone made a mistake or
(21) when you made a mistake?
(22) A    Me.
(23) Q    So when you made a mistake, he
(24) would take you to a corner?
(25) A    Yes.

Page 257

E. Stachnik

(2) Q    Okay.  And what would happen in
(3) that situation?
(4) A    So it was explained what mistake
(5) was made.
(6) Q    Okay.  Were you intimidated in
(7) that situation?
(8) A    Yes.  A lot.
(9) Q    Did you feel threatened?
(10) A    I didn't feel comfortable with it
(11) and I was upset.
(12) Q    What was upsetting to you about
(13) someone telling you you made a mistake?
(14) A    Because sometimes this mistake
(15) wasn't my fault.
(16) Q    Okay.
(17) A    Sometimes it was about the tables,
(18) but it wasn't that it was my fault.
(19) Q    So you were upset because you felt
(20) you were getting blamed for something you didn't
(21) do?
(22) A    So the mistake, it wasn't just
(23) that I was to blame for.
(24) Q    So it wasn't entirely your fault?
(25) A    I don't know.  Can I give you an

Page 258

E. Stachnik

(2) example not concerning Marcel, but Paul, that
(3) happened?
(4) Q    Sure.
(5) A    It happened when we started with
(6) Pulsd.  So a customer could use one after 8:00
(7) p.m.  So usually a customer would show a ticket
(8) or something on his phone, but we weren't
(9) completely informed what we should get from the
(10) customer, because nobody explained it to us.
(11) There was a problem about it, there was a
(12) problem connected with it, and Paul got upset,
(13) and I had to pay for it.  It was the first
(14) customer, and we didn't know how to deal with
(15) it.
(16) Q    Okay.  Hold on.  I'm going to cut
(17) you off because, once again, I think -- I did
(18) say give me the example, but we're going way off
(19) the path right now.
(20) What I'm really trying to focus on
(21) here is it sounds like what upset you when
(22) Marcel cornered you was that he was
(23) reprimanding you for something that you felt
(24) like wasn't your fault.  Is that accurate?
(25) A    Well, mostly I was responsible for

Page 259

E. Stachnik

(2) it, but there were different factors adding to
(3) it.
(4) Q    Okay.  Was there anything else
(5) that upset you when Marcel was -- again, I'm
(6) talking about when Marcel kind of cornered you.
(7) A    I was upset.
(8) Q    Okay.  Was there ever an occasion
(9) where Marcel cornered you and said, I was in the
(10) war, you don't know who I know, you piece of
(11) shit?
(12) A    No, it wasn't with me.  I don't
(13) remember.
(14) Q    Do you know -- did you ever see
(15) him do that to anyone else?
(16) A    I remember this once when he got
(17) upset, he was telling something to me, but not
(18) in the corner, it was at the bar, that he was at
(19) war and he experienced very much.  But he didn't
(20) want to talk anything else about what happened;
(21) that he was there two years, and some terrible
(22) things happened.
(23) MR. GRASTY:  Would you do me
(24) a favor and read back that answer,
(25) please.

Fink & Carney Reporting and Video Services
39 West 37th Street * New York, New York 10018
(800) NYC-FINK * (212) 869-3063